IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARION L. LAEMMERHIRT,          )
                                )
          Plaintiff,            )
                                )
     vs.                        ) Civil Action No. 06-270 Erie
                                )
COMMISSIONER OF SOCIAL          )
SECURITY,                       )
                                )
          Defendant.            )

## MEMORANDUM OPINION

### I. Introduction

Plaintiff, Marion L. Laemmerhirt, seeks judicial review of a
decision of Defendant, Commissioner of Social Security ("the
Commissioner"), denying her applications for disability insurance
benefits ("DIB") and supplemental security income ("SSI") under
Titles II and XVI, respectively, of the Social Security Act, 42
U.S.C. §§ 401-433 and §§ 1381-1383f.[1]  Presently before the Court
are the parties' cross-motions for summary judgment pursuant to
Fed.R.Civ.P. 56.  For the reasons set forth below, Plaintiff's
motion for summary judgment will be denied, and the
Commissioner's cross-motion for summary judgment will be granted.

---

[1]The Social Security system provides two types of benefits
based on an inability to engage in substantial gainful activity:
the first type, SSI, provides benefits to disabled individuals
who meet low-income requirements regardless of whether the
individuals have ever worked or paid into the Social Security
system, and the second type, disability insurance, provides
benefits to disabled individuals who have paid into the Social
Security system.  Belcher v. Apfel, 56 F.Supp.2d 662 (S.D.W.V.
1999).

1

## II. Background

### A. Procedural History

Plaintiff's current applications for DIB and SSI allege disability due to "MULTIPLE DISORDERS: FORGETS; SEES AND HEARS PEOPLE."[2] (Certified Copy of Record before Social Security Administration, "R." at 68-70, 120, 288-90). Following initial review, Plaintiff's applications were denied and she requested a hearing before an Administrative Law Judge ("ALJ"). (R. 48-49). At the hearing, which was held on July 18, 2005, Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified. (R. 298-327).

On January 25, 2006, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI. Specifically, the ALJ found that despite severe impairments, *i.e.*, depression, post-traumatic stress disorder and attention deficit hyperactivity disorder, Plaintiff retained the residual functional capacity ("RFC") to perform a significant range of work, including the

---

[2]Plaintiff's current application for SSI was filed on August 22, 2003, and her current application for DIB was filed on October 10, 2003. Although Plaintiff's current applications allege an onset date of disability of January 1, 1999, Plaintiff has stipulated that the onset date of disability for purposes of her current applications for DIB and SSI is October 10, 2001, the date on which Plaintiff's last application for disability benefits was denied. (R. 68-70, 288-90, 301-03). With respect to DIB, the Court also notes that Plaintiff's insured status expired on March 31, 2002. Thus, in order to receive DIB, Plaintiff must establish that she was disabled before that date.

jobs of janitor, hand packer and unarmed guard.[3]  (R. 27-28).
Plaintiff requested review of the ALJ's adverse decision.  (R.
10-11).  However, the request was denied by the Appeals Council
on September 22, 2006, rendering the ALJ's January 25, 2006
decision the final decision of the Commissioner.  (R. 5-7).  This
appeal followed.

## B.  Factual Background

Plaintiff was born on November 4, 1974.  She was 30 years
old at the time of the hearing before the ALJ.  With respect to
education, Plaintiff is a high school graduate.[4]  Plaintiff, who
is single, resides with her two minor children.[5]  She does not
have a driver's license.  In the past, Plaintiff has worked as a
cook in a fast food restaurant and in the cafeteria of a nursing
home.[6]  (R. 304-05, 318).

---

[3]The Social Security Regulations define RFC as the *most* a
claimant can still do despite his or her limitations.  See 20
C.F.R. § 404.1545(a).

[4]Plaintiff testified that she attended special education
classes during high school.  (R. 317).

[5]At the time of the hearing before the ALJ, Plaintiff's
children were 5 years old and 18 months old.  (R. 305, 311).

[6]On August 20, 2003, Plaintiff completed a Disability Report
in which she was asked to list the jobs she had held during the
previous 15 years.  In response, Plaintiff indicated that she was
employed as a restaurant cook from April 2000 to June 2000 on a
part-time basis, i.e., two days a week, 4 hours per day.  She
listed no other employment.  (R. 134).  During the hearing before
the ALJ, however, Plaintiff testified that she also worked in the
cafeteria of a nursing home in the 1990's.  (R. 318).

3

Regarding her alleged disabling conditions, Plaintiff testified that she is "afraid of a lot of people" and that she hears voices and sees people who are not there.[7]  At the time of the hearing before the ALJ, Plaintiff was not receiving any mental health treatment and she was not taking any medication.[8] (R. 306-09).  Despite her mental impairments, Plaintiff testified that she takes good care of her children, and that she is able to take care of her own personal needs and hygiene, keep her house adequately clean, cook, do the laundry, maintain a bank account and pay her own bills.  However, Plaintiff cannot go grocery shopping by herself due to her fear of crowds.  As a result, she relies on other people to go grocery shopping with her.  (R. 312-13, 315).

---

[7]Plaintiff testified that she hears her deceased mother's voice the most, although sometimes she hears her uncle's voice. (R. 308).  With regard to seeing people who are not there, Plaintiff testified that she sees her deceased mother "every single night, especially before I go to bed."  (R. 309).

[8]Plaintiff testified that, in the past, she had taken Paxil for her mental impairments.  When asked by the ALJ why she stopped taking Paxil, Plaintiff testified as follows: "I didn't have the function to go to my appointment and I would forget." (R. 307).  Paxil is prescribed to treat depression, panic disorders and social anxiety disorder.  www.nlm.nih.gov/medlineplus/druginfo (last visited 7/25/2007).

4

## **C. Evidence in the Record**[9]

On October 2, 1992, intellectual testing showed that

Plaintiff had the potential to function in the low average

range.[10]  The evaluator noted that Plaintiff had significant

difficulty in arithmetic and practical reasoning skills, visual

and auditory processing skills, auditory memory and verbal

comprehension and in her fund of general information.  It was

recommended that Plaintiff continue in her then present school

classification, which was learning disabled.[11]  (R. 80-82).

On September 14, 2001, Plaintiff underwent a consultative

psychiatric examination by William Reynolds, Psy.D. in connection

with her earlier applications for disability benefits.  At that

time, Plaintiff described her complaints as partial hearing loss

and emotional problems.[12]  Plaintiff denied seeing a

---

[9]The Court's summary of the evidence in this case includes
evidence pre-dating the alleged onset date of Plaintiff's
disability in October 2001.  Such evidence has been included for
background purposes.

[10]Plaintiff received the following scores on the Wechsler
Adult Intelligence Scale: Verbal IQ - 77, Performance IQ - 89,
Full Scale IQ - 81.  (R. 80).

[11]With respect to Plaintiff's senior year of high school
(1993-94), the Individualized Education Plan prepared for
Plaintiff indicated that she would attend regular education
classes for physical education and food service and special
education classes for world history, English and life skills.
(R. 82-83).

[12]Regarding her partial hearing loss, Plaintiff reported that
her father had hit her in the head and fractured several bones in
her ear.  (R. 227).  The Court notes that Plaintiff did not

5

psychiatrist, taking psychiatric medication or attending
outpatient therapy.[13]  She also denied any prior psychiatric
hospitalizations, although she reported at least two suicide
attempts, the last one having been around 1984.[14]  With respect
to symptoms, Plaintiff reported that she sometimes feels as if
someone is touching her on the shoulder when no one is present;
that she hears her deceased mother's voice; and that she sees her
deceased mother at bedtime when it is dark and quiet in the
house.  Plaintiff also reported symptoms of depression "or what
might be reported as [posttraumatic stress disorder] that
includes nightmares, difficulty concentrating, irritability and
fair to low mood."  As to personal history, Plaintiff reported
that her father murdered her mother when she was 2 years old, and
that her father physically and sexually abused her between the
ages of 4 and 11.  She also reported that she was single, never

---

include hearing loss among disabling conditions in her current
applications for DIB and SSI, and no testimony concerning hearing
loss was elicited by her counsel during the hearing before the
ALJ.  Rather, counsel elicited testimony regarding Plaintiff's
mental impairments to support her current applications for DIB
and SSI.

[13]Plaintiff did report seeing a counselor twice a week
through the Early Intervention Program, although the purpose of
this counseling is not clear from Dr. Reynolds' report.  (R.
227).  In this connection, the Court notes that the counseling
may been related to Plaintiff's son who has serious health
problems.

[14]In 1984, Plaintiff would have been no more than 10 years
old.

6

married and lived with her one-year old son. (R. 227-28). With respect to vocational history, Plaintiff reported that she quit a job as a prep cook in 1994 and a job as a dietary aide in 1996 due to difficulties resulting from her hearing problem. Plaintiff also reported quitting a subsequent job as a laborer because her ears hurt and she was experiencing migraine headaches. Regarding Plaintiff's general appearance, Dr. Reynolds noted that Plaintiff was neatly dressed, her hygiene, posture and motor activity were unremarkable, her eye contact was good, and she manifested a cooperative attitude. As to characteristics of speech and thought, Dr. Reynolds noted that Plaintiff's speech was normal in rate and tone, her responses were coherent and generally goal oriented, and she showed no evidence of obvious hallucinations, delusions, obsessions or compulsions. Dr. Reynolds described Plaintiff's mood and affect as appropriate, noting that Plaintiff cried when reporting that her father had murdered her mother and sexually abused her. With respect to sensory and intellectual functioning, Dr. Reynolds noted that Plaintiff was accurately oriented to time, place and person, her recent memory was intact although her concentration was substantially impaired, her general fund of information was fair, and her insight and judgment were fair to poor.[15] Finally,

---

[15]In connection with intellectual functioning, Dr. Reynolds also noted that although Plaintiff could not perform 100-7 serial

7

regarding mode of living, Plaintiff reported that her activities of daily living were intact. She was able to dress on her own, tend to her personal hygiene, cook and perform household chores without assistance, use public transportation independently, and shop and manage money without assistance. Plaintiff also reported that she had a best friend, as well as casual friends, and that she was dating. Finally, Plaintiff reported that her hobbies and interests included watching television, listening to the radio and crocheting. (R. 228-29).

Dr. Reynolds' diagnosis was posttraumatic stress disorder, and he recommended psychiatric services to evaluate medication therapy to manage Plaintiff's symptoms. Dr. Reynolds described Plaintiff's mental health prognosis as guarded, noting that she demonstrated limited to poor intellectual resources and limited to poor insight and judgment. (R. 229-30). As to work-related limitations, Dr. Reynolds opined that Plaintiff was mildly limited in (a) her ability to understand and remember short, simple instructions, (b) her ability to work in coordination with or proximity to others without being distracted, and (c) her ability to make simple work-related decisions. Dr. Reynolds further opined that Plaintiff was moderately limited in (a) her ability to maintain attention and concentration for extended

subtractions, she performed all three 10-3 serial subtractions without error. (R. 228).

8

periods, (b) her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and (c) her ability to accept instructions or respond appropriately to criticism from supervisors.  (R. 229).

On October 11, 2001, a State agency consultant, Madan Zohan, Ph.D., completed a Psychiatric Review Technique form based on a review of Plaintiff's file in connection with her earlier applications for disability benefits.  Dr. Zohan indicated that the listings on which his disposition was based were Listing 12.02 relating to Organic Mental Disorders and Listing 12.06 relating to Anxiety-Related Disorders.[16]  Dr. Zohan also indicated that referral of Plaintiff's case to another medical specialty was necessary due to the presence of a non-mental impairment (*i.e.*, hearing loss).  With respect to functional limitations, Dr. Zohan opined that Plaintiff was mildly restricted in activities of daily living and in maintaining concentration, persistence or pace; that Plaintiff was moderately limited in social functioning; and that Plaintiff had experienced one or two episodes of decompensation.  (R. 238-51).

On October 11, 2001, Dr. Zohan also completed a Mental RFC Assessment based on a review of Plaintiff's file, indicating that

---

[16]Dr. Zohan's selection of Listing 12.02 relating to Organic Mental Disorders was based on Plaintiff's classification as learning disabled and her scores on intellectual testing.  (R. 239).

Plaintiff was not significantly limited in various areas relating to understanding and memory, and that Plaintiff was not significantly limited or only moderately limited in various areas relating to sustained concentration and persistence, social interaction and adaptation. In explaining his assessment of Plaintiff's mental RFC, Dr. Zohan noted, among other things, that although Plaintiff reported depression, she had no history of psychiatric hospitalizations or outpatient psychiatric care, and that an examining psychologist opined that Plaintiff was capable of performing simple, work-related mental activities.[17] Therefore, Dr. Zohan opined that Plaintiff retained the ability to follow simple directions and maintain focus on simple tasks in a low contact, low demand work environment. (R. 252-54).

Based on Dr. Zohan's indication that referral of Plaintiff's case to another medical specialty was necessary due to the presence of a non-mental impairment, *i.e.*, hearing loss, Plaintiff was referred for a hearing consultative examination. However, Plaintiff failed to keep the appointment or otherwise respond to the referral. As a result, her earlier applications for disability benefits were denied for failure to cooperate. (R. 98).

---

[17]With respect to Dr. Zohan's reference to the opinion of an examining psychologist, it appears that he was referring to the report completed by Dr. Reynolds following his consultative psychiatric examination of Plaintiff on September 14, 2001.

10

        On February 9, 2002, after having run into the woods with a butcher knife following an argument with her fiancé, Plaintiff was admitted to Warren General Hospital for evaluation and treatment of depression and suicidality.[18] During her initial evaluation, Plaintiff, who was five months' pregnant, reported significant deprivation, abuse and chaos in her life, as well as significant psychosocial stressors, including missing her mother who she claimed was murdered by her father and thrown down a well, sexual abuse by her father from age 4 to age 11, placement in numerous foster homes, the illness of her two-year old son who had a chromosome deficiency resulting in very poor muscle tone which required ongoing therapy and supervision, the abortion of twins five years previously, and her decision to place the child she was carrying for adoption. Plaintiff also reported no past psychiatric treatment, although she did talk to counselors or in-home nurses about her past abuse.[19] (R. 160-62).

[18]Despite the reference to suicidality in the report relating to Plaintiff's psychiatric admission, Plaintiff denied that she had been suicidal. When asked about her intent when she ran into the woods with a knife, Plaintiff responded: "I don't know." (R. 160).

[19]It appears that the counselors and nurses to whom Plaintiff was referring provided in-home services for Plaintiff's children. At the hearing before the ALJ, Plaintiff testified that a physical therapist and an occupational and speech therapist came to her home on a weekly basis to provide services for her children. (R. 311).

With respect to Plaintiff's mental status examination at the

time of her admission to Warren General Hospital on February 9,

2002, her thinking was concrete, goal directed and organized.

Plaintiff denied auditory hallucinations, although she

acknowledged visions of her deceased mother which appeared to be

self-induced and soothing as opposed to egodystonic.  Plaintiff's

mood was described as depressed and overwhelmed, and her affect

was described as "quite tearful and sad."  Plaintiff's fund of

knowledge was described as fair, her memory was described as

unimpaired and her concentration was described as mildly

impaired.  Plaintiff's psychiatric diagnosis was listed as "Major

depressive disorder, moderate to severe, Rule out psychotic

features, Rule out post traumatic stress disorder."  Plaintiff's

score on the Global Assessment of Functioning ("GAF") Scale was

assessed to be 30 at the time of the hospital admission, and her

highest GAF scores during the previous year were assessed to be

between 60 and 70.[20]  (R. 163-64).

_____

        [20]The GAF Scale considers psychological, social, and
occupational functioning on a hypothetical continuum of mental
health - illness.  The highest possible score is 100, and the
lowest is 1.  A GAF score of 30 denotes behavior that **"is
considerably influenced by delusions or hallucinations OR serious
impairment in communication or judgment** (e.g., sometimes
incoherent, acts grossly inappropriately, suicidal preoccupation)
**OR inability to function in almost all areas** (e.g., stays in bed
all day; no job, home, or friends)."  A GAF score of 60 denotes
**"moderate symptoms** (e.g., flat affect and circumstantial speech,
or occasional panic attacks) **OR moderate difficulty in social,
occupational, or school functioning** (e.g., few friends or

                                12

Plaintiff was discharged from Warren General Hospital on
February 13, 2002 with a final diagnosis of "Major depressive
episode, without psychotic features, severe." Her GAF score at
the time of discharge was assessed to be 50.[21] The discharge
summary indicates that Plaintiff's treatment while hospitalized
included individual, family, group, art and recreational
therapies, as well as Paxil, an antidepressant medication. The
discharge summary also indicates that Plaintiff tolerated the
Paxil well and reported significant improvement. Plaintiff denied
any significant side effects from the Paxil and indicated that
she would follow-up with psychiatric services at the Department
of Human Services. (R. 157-59).

Plaintiff failed to follow-up with psychiatric services at
the Department of Human Services, and, on May 3, 2002, she went
to the Emergency Department of Warren General Hospital for a

_____

conflict with peers or co-workers)." GAF scores between 61 and
70 denote "**[s]ome mild symptoms** (e.g., depressed mood and mild
insomnia) **OR some difficulty in social, occupational, or school
functioning** (e.g., occasional truancy, or theft within the
household), **but generally functioning pretty well, has some
meaningful interpersonal relationships.**" Diagnostic and
Statistical Manual of Mental Disorders, 4th Edition, Text
Revision, Washington, D.C., American Psychiatric Association,
2000 ("DSM IV"), at p. 34 (bold face in original).

[21]A GAF score of 50 denotes "**[s]erious symptoms** (e.g.,
suicidal ideation, severe obsessional rituals, frequent
shoplifting) **OR any serious impairment in social, occupational,
or school functioning** (e.g., no friends, unable to keep a job)."
DSM IV, at p. 34 (bold face in original).

13

refill of her Paxil prescription.  Plaintiff reported that her

mood swings had returned after she stopped taking Paxil the

previous week.  Plaintiff was described as alert, oriented to

time, place and person and in no acute distress.  Plaintiff's

Paxil prescription was refilled and she was instructed to follow-

up with the doctor who was taking care of her in connection with

her pregnancy.  (R. 155-56).

On July 12, 2002, Plaintiff underwent a psychiatric

evaluation by Reynaldo Puesan, M.D.  With respect to the history

of her presenting illness, Plaintiff informed Dr. Puesan that she

had been admitted to Warren General Hospital in February 2002 for

depression; that she had since given birth to a baby boy whom she

had placed for adoption; that she had been taking 20 mg. of Paxil

regularly since the February 2002 psychiatric admission which was

"very helpful;" that she was not depressed or sad and had no

further suicidal thoughts, although she continued to have

problems in her relationship with her boyfriend;[22] that she

enjoyed crocheting; and that she spent a lot of time with her son

who was severely ill, in therapy and required a great deal of her

attention.  As to medical history, Plaintiff informed Dr. Puesan

that she had significant hearing loss in one ear as a result of a

---

[22]Plaintiff also denied any suicidal attempt or gesture prior
to February 2002, which is inconsistent with the information
provided to Dr. Reynolds at the time of her consultative
psychiatric examination on September 14, 2001.  (R. 165, 227).

tympanic rupture suffered when her father hit her in the head
with the palm of his hand.[23]  With respect to Plaintiff's mental
status examination, Dr. Puesan indicated that Plaintiff was
alert, oriented to time, place and person and cooperative during
the interview; that Plaintiff made good eye contact and responded
to questions spontaneously; that Plaintiff was goal directed with
no looseness of associations or overt delusions; that Plaintiff
denied any hallucinatory experiences;[24] that Plaintiff was able
to do simple calculations, was concrete in her thinking and
appeared to be of low average intelligence; and that Plaintiff's
insight and judgment appeared to be good at that time.  Dr.
Puesan's diagnosis was described as "Major depression - single
episode," and Plaintiff's GAF score was assessed to be 65.[25]

_____

[23]With respect to her father, Plaintiff also informed Dr.
Puesan about being an eyewitness to the murder of her mother by
her father at the age of 2 and about being sexually abused by her
father from age 4 to age 11 which eventually led to her father
serving a 2-year prison term.  Plaintiff also informed Dr. Puesan
that she had been sexually abused in one of the five foster homes
in which she was placed following the report of her father's
sexual abuse.  (R. 165).

[24]Plaintiff's denial of any hallucinatory experiences also
conflicts with the information provided by Plaintiff to Dr.
Reynolds during the September 2001 consultative psychiatric
examination.  (R. 166, 227).

[25]As noted in footnote 20, a GAF score of 65 denotes "**[s]ome
mild symptoms** (e.g., depressed mood and mild insomnia) **OR some
difficulty in social, occupational, or school functioning** (e.g.,
occasional truancy, or theft within the household), **but generally
functioning pretty well, has some meaningful interpersonal
relationships**."  DSM-IV, at p. 34 (bold face in original).

15

Although Dr. Puesan recommended individual therapy to deal with Plaintiff's history of abuse and recurrent recollections of her mother's alleged murder, Plaintiff indicated that she had "a good girlfriend with whom she speaks and doesn't feel that she has a need to come in and see a counselor and in any case, she is currently not significantly distressed with the past history of abuse." Plaintiff was continued on 20 mg. of Paxil daily and instructed to return in 4 weeks to see a psychiatric nurse for re-assessment. (R. 165-66).

On August 12, 2002, Plaintiff was seen by Lyn M. Kell, a registered nurse, for a medication check. Plaintiff's appearance was described as clean and neat, and her affect was described as "mostly euthymic."[26] Plaintiff made fair eye contact, smiled appropriately, and was cooperative and straightforward in her answers, although she did not mention the recent birth of a son whom she had placed for adoption. Plaintiff reported that her 2½-year old son, who has a chromosome deficiency, needed heart surgery, a hernia repair and surgery to prevent him from being tongue-tied, and she was angry that her boyfriend, who drove a truck during the week and was only home on weekends, showed little interest in this son or his health problems. Plaintiff

---

[26]"Euthymia" is a medical term describing "a state of mental tranquility and well-being; neither depressed nor manic." Dorland's Illustrated Medical Dictionary, at p. 662 (31st ed. 2007).

16

reported that in addition to keeping up with her housework and caring for her son, she also was caring for a puppy that she planned to give away because her son was allergic to it. Plaintiff indicated that she was willing to participate in individual therapy, although she denied being depressed or having any thoughts of hurting herself. (R. 167).

On October 21, 2002, Plaintiff saw Dr. Puesan for a medication check, reporting that she was doing "very well." Plaintiff also reported having been very stressed during her son's recent surgery to close a hole in his heart, but that the surgery was successful and she handled the situation "quite well." Plaintiff denied any side effects from the Paxil. She also reported attending therapy on a regular basis, which was beneficial.[27] Dr. Puesan noted that Plaintiff appeared to be doing "quite well," and that, therefore, she would be continued on her current medication and therapy. (R. 168).

On January 23, 2003, Plaintiff was seen by Dolly Nuhfer, a registered nurse, for a medication check. Plaintiff was described as well groomed with a euthymic affect which was "bright at times." Plaintiff reported being compliant with her Paxil and denied any side effects. Plaintiff reported sleeping

---

[27]With respect to Plaintiff's report that she was attending therapy, the Court notes that the record does not include any evidence regarding this therapy.

17

well at night and eating three well-balanced meals daily.
Plaintiff denied any recent major depressive episodes, although
she did ruminate at times about giving up her baby for adoption.
Plaintiff reported that she was very pleased with the progress of
her 3-year old son since his heart surgery, and she denied any
problems or concerns at that time.  Plaintiff also reported that
she continued to remain active caring for her 3-year old son and
home, and that she enjoyed crocheting and other crafts.  A refill
of Plaintiff's Paxil prescription was called into the pharmacy.
(R. 169).

On March 25, 2003, Plaintiff saw Dr. Puesan for a medication
check.  At that time, Plaintiff reported feeling increasingly
more depressed, although there were reasons for her depression.
Her sister had passed away the previous month and the first
anniversary of giving her son up for adoption was approaching.
Plaintiff reported that she continued to take Paxil without any
ill effects, and that she believed the Paxil to be helpful.  Dr.
Puesan encouraged Plaintiff to continue individual therapy and he
increased the dosage of her Paxil to 30 mg. daily.  (R. 170).

The last record of a medication check is dated June 18,
2003.  Nurse Nuhfer noted that Plaintiff's affect was euthymic
and her thought process was clear and well organized throughout
the appointment.  Plaintiff reported that she had been compliant
in taking 30 mg. of Paxil, which had been cleared by her

18

obstetrician because she was pregnant again.  Plaintiff stated

that she intended to keep this baby and move out of her current

living situation because it was abusive and hostile.  Plaintiff

reported being inconsistent with therapy, making multiple excuses

for not attending.  Plaintiff denied depressive symptoms or

suicidal thoughts, she reported sleeping well and having a good

appetite and she denied any other problems or concerns.[28]  (R.

171).

On November 15, 2003, Ann McDonald, M.D. performed a

consultative psychiatric evaluation of Plaintiff at the request

of the Pennsylvania Bureau of Disability Determination.

Plaintiff appeared for the evaluation with her "husband" and one-

month old daughter,[29] and they were all present in the interview

room with Dr. McDonald.[30]  Regarding her history, Plaintiff

---

[28]The note of this medication check indicates that Plaintiff
was to be evaluated by Dr. Puesan in August.  However, the record
does not contain evidence of any further treatment by Dr. Puesan.

[29]It appears that Dr. McDonald mistakenly believed
Plaintiff's boyfriend to be her husband.  There is no evidence in
the record that Plaintiff has ever been married.  In fact, during
the hearing before the ALJ, Plaintiff testified that she was
single.  (R. 304-05).

[30]The doctor described Plaintiff as a "fair" source of
information, noting the following: "Her husband on the other hand
tended to speak up quite spontaneously with additional
information that was generally of some assistance, although I
actually did have to attempt a couple of occasions to make sure
that he was not being the one to respond to the questions, but at
least giving her the opportunity to respond.  Because even when
we got to doing the actual Mental Status Examination, he was
tending to just jump into the answer, but he did cooperate well

19

informed Dr. McDonald, among other things, that she last worked

in 1997 for about a five-month period prepping food and washing

dishes;[31] that she left this job because she became very

depressed due to thoughts of her mother who had died when

Plaintiff was only 2 years old;[32] that she remained with her

father until she was 11 or 12 years old; that she was removed

from her father's care when she reported to authorities that he

was molesting her; that she was then placed in five different

foster homes; that she did not have any medical problems with the

exception of multiple surgeries to her left ear due to injuries

sustained in a beating by her father; and that she considered

---

with my request."   (R. 256).

[31]Apparently, Plaintiff did not inform Dr. McDonald about her brief period of employment in 2000 as a cook in a fast food restaurant.

[32]With respect to her mother's death, Plaintiff told Dr. McDonald that she remembered being awakened by her mother's cry when she was 2 years old, creeping down the stairs and seeing her parents struggling before they went out on the porch and her father killed her mother.  Plaintiff then told Dr. McDonald that her father threw her mother's body into a well, and that when the police attempted to recover her mother's body from the well many years later, they could not find it.  Plaintiff's husband told Dr. McDonald that Plaintiff's story about her mother's death was the subject of an episode on a major TV crime show.  (R. 257). Regarding Plaintiff's report that she left her job as a prep cook in 1997 due to depression, the Court notes that this statement is not supported by any medical evidence and conflicts with information provided by Plaintiff to Dr. Reynolds during her consultative psychiatric examination in September 2001. Specifically, Plaintiff informed Dr. Reynolds that she left this employment because her ears hurt and she was experiencing migraine headaches.  (R. 228).

20

herself to be very depressed, although she felt much better since her daily dosage of Paxil had been increased from 20 mg. to 30 mg. five months earlier.[33]   (R. 256-57).

With respect to Plaintiff's mental status examination, Dr. McDonald noted that Plaintiff presented as being very depressed with low self esteem; that she cried much of the time; and that she had a "strong quality of magical thinking."  Dr. McDonald also noted that Plaintiff reported hearing voices, primarily her mother's voice, calling to her at night.[34]  Dr. McDonald estimated Plaintiff's intellectual functioning to be in the range of 80 to 85, and then indicated that this may be a high estimate.[35]  Dr. McDonald also indicated that Plaintiff was not

_____

[33]Dr. McDonald noted that when Plaintiff indicated she felt very depressed, her "husband" spoke up and voiced concerns about Plaintiff's ability to care for her son and daughter.  (R. 257). At the hearing before the ALJ, in response to a question concerning her ability to care for her children, Plaintiff testified as follows: "... I take good, good care of my kids.  My kids are well bathed, well fed, well dressed."  (R. 311).

[34]In this connection, Dr. McDonald further noted that Plaintiff had been hearing voices for "quite a while," and that it was Plaintiff's "husband" who actually brought the subject up. (R. 258).  During the hearing before the ALJ, Plaintiff testified that the voices never tell her to do bad things to herself or others.  Rather, the voices tell her to do things like "the dishes."  (R. 308-09).

[35]With regard to intellectual functioning, Dr. McDonald also noted that Plaintiff was unable to perform serial 7 subtractions, and that she was able to perform serial 3 subtractions only "with significant error."  (R. 258).  This latter observation conflicts with Plaintiff's performance during her consultative psychiatric examination by Dr. Reynolds in September 2001 when she was able to perform serial 3 subtractions without error.  (R. 228).

21

capable of managing benefits.[36]  Dr. McDonald described

Plaintiff's diagnoses as follows:

DIAGNOSES:

AXIS I:    Posttraumatic stress disorder, severe, profound.
           Attention-deficit disorder with hyperactivity.
AXIS II:   Borderline personality disorder.
AXIS III:  Status post surgery to left ear.
AXIS IV:   Profound psychosocial stressors beginning with the
           loss of her mother, how this came about, as well
           as the fact that she has been abused.
AXIS V:    Global Assessment of Function = 35.[37]

(R. 258-59).

Regarding work-related activities, Dr. McDonald opined that

Plaintiff was markedly limited in the following areas: (1)

ability to understand, remember and carry out detailed

instructions, (2) ability to make judgments on simple work-

related decisions, (3) ability to interact appropriately with the

public, supervisors and co-workers, and (4) ability to respond

appropriately to work pressures in a usual work setting.  (R.

261).

---

[36]The Court notes that Dr. McDonald's opinion regarding
Plaintiff's ability to manage benefits conflicts with Plaintiff's
hearing testimony, *i.e.*, that she maintains a bank account and
pays her own bills.  (R. 313).

[37]A GAF score between 31 and 40 denotes **some impairment in
reality testing or communication** (e.g., speech is at times
illogical, obscure, or irrelevant) **OR major impairment in several
areas, such as work or school, family relations, judgment,
thinking, or mood** (e.g., depressed man avoids friends, neglects
family, and is unable to work; child frequently beats up younger
children, is defiant at home, and is failing at school).  DSM-IV,
at p. 34 (bold face in original).

22

On January 20, 2004, Raymond Dalton, Ph.D., a State agency
consultant, completed a Psychiatric Review Technique form based
on a review of Plaintiff's file. Dr. Dalton indicated that the
categories on which his disposition was based were Listings
12.04, 12.06 and 12.08, relating to Affective Disorders, Anxiety-
Related Disorders and Personality Disorders, respectively.[38]   (R.
263-72).  With respect to functional limitations, Dr. Dalton
opined that Plaintiff was mildly limited in activities of daily
living; that Plaintiff was moderately limited in social
functioning and in concentration, persistence and pace; and that
Plaintiff had experienced 1 or 2 episodes of decompensation.  (R.
273).

On January 20, 2004, Dr. Dalton also completed a Mental RFC
Assessment based on a review of Plaintiff's file.  With respect
to understanding and memory, Dr. Dalton opined that Plaintiff was
moderately limited in her ability to remember locations and work-
like procedures and in her ability to understand and remember
detailed instructions.  As to sustained concentration and
persistence, Dr. Dalton opined that Plaintiff was moderately
limited in her ability to carry out very short and simple
instructions, her ability to maintain attention and concentration

---

[38]The listings chosen by Dr. Dalton appear to be based on
Plaintiff's one-time hospitalization for major depression and Dr.
McDonald's diagnoses of posttraumatic stress disorder and
borderline personality disorder.

for extended periods, her ability to work in coordination with or close proximity to others without being distracted by them, and her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and that Plaintiff was markedly limited in her ability to carry out detailed instructions. Regarding social interaction, Dr. Dalton opined that Plaintiff was moderately limited in her ability to interact appropriately with the general public, her ability to accept instructions and respond appropriately to criticism from supervisors, and her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Finally, as to adaptation, Dr. Dalton opined that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting. (R. 276-77).

In explaining his opinion, Dr. Dalton noted that he did not give full weight to the report of Dr. McDonald because she relied heavily on Plaintiff's subjective report of symptoms and limitations which were not supported by the totality of the evidence and, as a result, overestimated the severity of Plaintiff's functional limitations. With respect to Plaintiff's ability to engage in substantial gainful activity, Dr. Dalton stated:

> The claimant's ability to understand and remember complex or detailed instructions is limited, however, she would be expected to understand and remember simple one and two step

24

instructions. Her basic memory processes are intact.
Additionally, she can perform simple, routine, repetitive
work in a stable environment. She can make simple
decisions. She is able to get along with others in the
workplace without distracting them. She can sustain an
ordinary routine and adapt to routine changes without
special supervision. Review of the medical evidence reveals
that the claimant retains the abilities (sic) to manage the
mental demands of many types of jobs not requiring
complicated tasks.

(R. 278).

### III.  Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C.
§ 405(g) and § 1383(c)(3) (incorporating § 405(g)), which provide
that an individual may obtain judicial review of any final
decision of the Commissioner by bringing a civil action in the
district court of the United States for the judicial district in
which the individual resides.  Based upon the pleadings and the
transcript of the record, the district court has the power to
enter a judgment affirming, modifying or reversing the
Commissioner's decision with or without a remand for a rehearing.

The Court's review of the Commissioner's decision is limited
to determining whether the decision is supported by substantial
evidence, which has been described as "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).
It consists of something more than a mere scintilla, but
something less than a preponderance.  Dobrowolsky v. Califano,

25

606 F.2d 403, 406 (3d Cir.1979).   Even if the Court would have
decided the case differently, it must accord deference to the
Commissioner and affirm the findings and decision if supported by
substantial evidence.   Monsour Medical Center v. Heckler, 806
F.2d 1185, 1190-91 (3d Cir.1986).

## IV.   Legal Analysis

### A.   The ALJ's Decision

In order to establish a disability under the Social Security
Act, a claimant must demonstrate an inability to engage in any
substantial gainful activity due to a medically determinable
physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a
continuous period of not less than 12 months.   42 U.S.C.
§ 423(d)(1).   A claimant is considered unable to engage in any
substantial gainful activity only if his physical or mental
impairment or impairments are of such severity that he is not
only unable to do his previous work but cannot, considering his
age, education, and work experience, engage in any other kind of
substantial gainful work which exists in the national economy.
42 U.S.C. § 423(d)(2)(A).

In Burnett v. Commissioner of Social Security Admin., 220
F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure
an ALJ must follow in evaluating a claim for Social Security
disability benefits, stating in relevant part:

* * *

In Plummer, we recounted the five step sequential evaluation for determining whether a claimant is under a disability, as set forth in 20 C.F.R. § 404.1520:

In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a). If a claimant is found to be engaged in substantial gainful activity, the disability claim will be denied. Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287, 2290-91, 96 L.Ed.2d 119 (1987). In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir.1994).

If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effects of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.

27

Plummer, 186 F.3d at 428.

\*   \*   \*

220 F.3d at 118-19.

With respect to the ALJ's application of the five-step
sequential evaluation process in the present case, steps one and
two were resolved in Plaintiff's favor: that is, the ALJ found
that Plaintiff had not engaged in substantial gainful activity
since her alleged onset date of disability, and the evidence
established that Plaintiff suffers from depression, post-
traumatic stress disorder and attention deficit hyperactivity
disorder, which are severe impairments. (R. 27). Turning to
step three, the ALJ found that Plaintiff's impairments were not
sufficiently severe to meet or equal the requirements of Listings
12.04, 12.06 and 12.08 in 20 C.F.R., Pt. 404, Subpt. P, App. 1,
relating to Affective Disorders, Anxiety-Related Disorders and
Personality Disorders, respectively. (R. 23-24). As to step
four, the ALJ found that Plaintiff could not perform her past
relevant work due to her impairments. (R. 25-26). Finally,
regarding step five, based on the testimony of the VE, the ALJ
found that, considering Plaintiff's age, education, past work
experience and RFC, there were a significant number of jobs in
the national economy which Plaintiff could perform, including the
jobs of janitor, hand packer and unarmed guard. (R. 26-27).

## B. Plaintiff's Arguments

### 1.

Turning first to the issue of hearing loss, Plaintiff asserts that the ALJ erred by failing to obtain a consultative hearing examination in light of her well-documented hearing loss in the left ear and by failing to include limitations resulting from the hearing loss in the hypothetical questions posed to the VE. (Pl's Brief, pp. 12, 14). After consideration, the Court concludes that this argument is meritless.

Plaintiff included hearing loss among her alleged disabling impairments in earlier applications for disability benefits, and, on October 11, 2001, Dr. Zohan, who completed a Mental RFC Assessment in connection with those applications, noted that a referral of Plaintiff's case to another medical specialty was necessary due to the presence of a non-mental impairment, *i.e.*, hearing loss. As a result, Plaintiff was referred for a consultative hearing examination. However, Plaintiff failed to keep the appointment or otherwise respond to the referral and the earlier applications for disability benefits were denied due to failure to cooperate.

With respect to Plaintiff's current applications for DIB and SSI, (a) hearing loss was not included among Plaintiff's

29

disabling impairments,[39] (b) counsel failed to elicit any
testimony concerning Plaintiff's hearing loss or any functional
limitations resulting from the hearing loss at the hearing before
the ALJ, focusing, instead, entirely on her mental impairments
(R. 314-18), (c) Plaintiff informed Dr. McDonald during her
consultative psychiatric examination in November 2003 that she
quit her last job due to depression, not problems resulting from
hearing loss (R. 256), (d) there are no notations in the record
by any testing, examining or treating source that Plaintiff
displayed hearing difficulties, and (e) there is absolutely no
evidence of any medical treatment or care for problems related to
hearing loss. Under the circumstances, substantial evidence
supports the ALJ's determination that Plaintiff's hearing loss is
not a severe impairment (R. 17), and the ALJ properly omitted
from his hypothetical questions to the VE any functional
limitations resulting from hearing loss. See Schaudeck v.
Commissioner of Social Security, 181 F.2d 429, 431 (3d Cir.1999)
(noting that the substantial evidence standard is deferential and
includes deference to inferences drawn from facts if they, in
turn, are supported by substantial evidence).

---

[39]As noted earlier, Plaintiff's disabling impairments were
described in her current applications for DIB and SSI as follows:
"MULTIPLE DISORDERS: FORGETS; SEES AND HEARS PEOPLE." (R. 120).

30

**2.**

Next, Plaintiff asserts that the ALJ erred by declining to give any weight to the opinion of Dr. McDonald who conducted the consultative psychiatric examination of Plaintiff in November 2003, and by failing to include in the hypothetical questions posed to the VE the marked limitations in Plaintiff's ability to perform work-related activities noted by Dr. McDonald in her report.[40] (Pl's Brief, p. 12, 14). After consideration, the Court concludes that this argument also is meritless.

In his decision, the ALJ discussed in detail the evidence of record on which he relied to disregard Dr. McDonald's opinion that Plaintiff was markedly limited in her ability to perform various work-related activities. Specifically, the ALJ noted that (a) Dr. Reynolds, the consultative examiner who performed a psychiatric evaluation of Plaintiff less than one month before her alleged onset date of disability of October 10, 2001, opined that Plaintiff had only mild or moderate limitations in her ability to perform various work-related activities (R. 18); (b)

_____

[40]As noted in the summary of the evidence in this case, following Plaintiff's consultative psychiatric examination in November 2003, Dr. McDonald opined that Plaintiff was markedly limited in the following work-related activities: (1) ability to understand, remember and carry out detailed instructions, (2) ability to make judgments on simple work-related decisions, (3) ability to interact appropriately with the public, supervisors and co-workers, and (4) ability to respond appropriately to work pressures in a usual work setting. (R. 261).

31

Plaintiff failed to act on Dr. Reynolds' recommendation concerning the pursuit of psychiatric services to evaluate medication therapy to manage her symptoms (R. 19); (c) although Plaintiff was admitted to the hospital in February 2002 for a major depressive episode, she reported significant improvement on medication with no adverse side effects following a brief period of hospitalization, and she failed to follow-up with outpatient therapy as instructed upon her discharge from the hospital (R. 19-20); (d) at the time of Plaintiff's admission to the hospital in February 2002, her GAF scores during the previous year were assessed to be between 60 and 70, denoting only mild to moderate symptoms (R. 19); (e) there is no evidence of any further mental health treatment until approximately three months later, when Plaintiff went to the hospital's emergency room in May 2002 for a refill of Paxil, reporting that she had been doing "quite well" on the Paxil but had begun to experience mood swings since running out of the medication a week earlier (R. 20); (f) there is no evidence of any further mental health treatment until July 2002, approximately two months later, when Plaintiff was evaluated by Dr. Puesan and she reported that the Paxil was "very helpful," that she was not feeling depressed or sad, and that she was not interested in Dr. Puesan's recommendation of individual therapy because she was not significantly distressed about her past history of abuse at that time and she had a good girlfriend

32

with whom she could speak when needed (R. 20-21); (g) Dr. Puesan
assessed Plaintiff's GAF score to be 65 when he evaluated her in
July 2002, denoting only mild symptoms (R. 20); (h) during a
medication check with a psychiatric nurse in August 2002,
Plaintiff's affect was described as "mostly euthymic," she
reported keeping up with her housework, caring for her ill child
and taking care of a puppy, and she specifically denied being
depressed (R. 21); (i) during a medication check with Dr. Puesan
in October 2002, Plaintiff reported doing "very well" and
handling her son's recent heart surgery "quite well" (R. 21); (j)
during a medication check with a psychiatric nurse in January
2003, Plaintiff's affect was described as euthymic, even bright
at times, she reported sleeping well and eating three well-
balanced meals a day, she denied any recent major depressive
episodes, problems or concerns, and she denied any ill effects
from the Paxil (R. 21); (k) during a medication check with Dr.
Puesan in March 2003, although Plaintiff reported increased
depression due to the recent death of her sister and the upcoming
one-year anniversary of giving up her baby for adoption, she
reported that the Paxil had been helpful (R. 21); (l) during a
medication check with a psychiatric nurse in June 2003,
Plaintiff's affect was described as euthymic, she denied any
depressive symptoms and she reported sleeping well and a good
appetite (R. 21); (m) there is no evidence of further mental

33

health treatment by Dr. Puesan, or any other mental health care provider, between June 2003 and the hearing before the ALJ in July 2005, a period of over two years (R. 24); and (n) several non-examining State agency medical consultants assessed Plaintiff's work-related limitations as only mild or moderate. (R. 25).

Clearly, the foregoing evidence constitutes substantial evidence supporting the ALJ's decision to (1) give substantial weight to the records of Dr. Puesan, a treating source for one year during the relevant time period, (2) give considerable weight to the assessments of Plaintiff's work-related limitations made by State agency medical consultants, and (3) give no weight to the opinion of Dr. McDonald, a one-time consultative examiner. The Court agrees with the ALJ's observation that "... Dr. McDonald's conclusions are supported only by the claimant's performance during that consultative examination, and are so completely at odds with the weight of the other substantial medical evidence in (sic) record, especially the years (sic) progress notes from Dr. Puesan, the claimant's **treating** psychiatrist, as to be given no weight." (R. 23).

### 3.

Next, Plaintiff challenges the ALJ's credibility determination. (Pl's Brief, p. 11). After consideration, the Court finds Plaintiff's argument unpersuasive.

34

In finding that Plaintiff was not entirely credible in
connection with her applications for DIB and SSI, the ALJ noted
various inconsistencies in statements made by Plaintiff
concerning her mental impairments, including the following: (a)
the history given by Plaintiff at the time of her psychiatric
admission to the hospital in February 2002 contradicted the
information she provided to Dr. Reynolds during her consultative
psychiatric examination in September 2001, five months earlier,
with respect to past mental health treatment and auditory
hallucinations (R. 19), (b) during her initial evaluation by Dr.
Puesan in July 2002, Plaintiff specifically denied any suicide
attempts other than the February 2002 incident resulting in her
hospitalization, which contradicted the information she provided
to Dr. Reynolds during the September 2001 consultative
psychiatric examination (R. 20), (c) Plaintiff informed Dr.
McDonald during the consultative psychiatric examination in
November 2003 that she stopped working due to depression, which
contradicted the information provided by Plaintiff to Dr.
Reynolds during the consultative psychiatric examination in
September 2001, *i.e.*, that she stopped working due to hearing
problems and migraine headaches (R. 22), and (d) the
inconsistency in Plaintiff's ability to perform 10-3 serial

subtractions during the consultative psychiatric examinations performed by Dr. Reynolds and Dr. McDonald.[41]  (R. 23).

With respect to Plaintiff's credibility, the ALJ also noted that Plaintiff's complaint of feeling "very depressed" to Dr. McDonald in November 2003 contrasts starkly with the progress notes of her mental health care under Dr. Puesan's supervision beginning in July 2002 and ending in June 2003, only a few months earlier, which indicate that Plaintiff was doing very well and denied feelings of depression or sadness.[42]  (R. 22).  In addition, the ALJ noted the behavior of Plaintiff's "husband" during the consultative psychiatric examination in November 2003, including his attempt to answer Dr. McDonald's questions on Plaintiff's behalf and the fact that he brought up the issue of auditory hallucinations, *i.e.*, Plaintiff's report that she hears

---

[41]As noted previously, during her consultative psychiatric examination by Dr. Reynolds in September 2001, Plaintiff performed 10-3 serial subtractions without error.  However, when asked to perform the identical serial subtractions by Dr. McDonald in November 2003, Plaintiff was unable to do so.  (R. 228, 258).

[42]Similarly, the ALJ noted that Plaintiff's demonstration of a "strong quality of magical thinking" during her consultative psychiatric examination by Dr. McDonald in November 2003 is in stark contrast to the notes of Plaintiff's year long treatment under Dr. Puesan's supervision, when she was described as euthymic, oriented to time, place and person, goal directed without looseness of associations and clear with regard to thought process, and she denied hallucinatory experiences.  (R. 166-67, 169, 171).

36

the voice of her deceased mother.[43]  (R. 22).  In addition, the
ALJ noted that despite Plaintiff's presentation to Dr. McDonald
during the November 2003 consultative psychiatric examination,
she acknowledged being the sole caregiver to her four year old
son and one month old daughter during the week because her
"husband" was a truck driver.  (R. 23).  In addition, the ALJ
noted Plaintiff's poor work history (R. 17), which is a
permissible factor for an ALJ to consider with regard to a
disability claimant's credibility.  See Schaal v. Apfel, 134 F.3d
496, 502-03 (2d Cir.1998)(ALJ could consider claimant's poor work
history in evaluating her credibility in social security
disability case).  Finally, the ALJ noted the absence of evidence
of any mental health treatment or medication for the two-year
period prior to Plaintiff's hearing before the ALJ, which
reflects adversely on her claim of disabling mental
impairments.[44]  (R. 23).

---

[43]In this connection, the ALJ also noted the lack of
notations of complaints of any auditory or visual hallucinations
during Plaintiff's entire period of care under Dr. Puesan's
supervision, which conflicts with the information provided to Dr.
McDonald at the time of the November 2003 consultative
psychiatric examination.  (R. 22).

[44]Social Security Rulings are agency rulings published "under
the authority of the Commissioner of Social Security" and "are
binding on all components of the Social Security Administration.
See Sykes v. Apfel, 228 F.3d 259, 271 (3d Cir.2000).  As noted by
the Commissioner (Df's Brief, pp. 15-16), Social Security Ruling
96-7p, which relates to the assessment of a disability claimant's
credibility, provides that an "individual's statements may be
less than credible if the level or frequency of treatment is

37

Clearly, the ALJ's credibility determination is supported by substantial evidence.

**4.**

Next, Plaintiff asserts that the ALJ erred by failing to make an individualized assessment of her response to the demands of work in accordance with Social Security Ruling 85-15,[45] and by failing to include her stress-related limitations in his hypothetical questions to the VE. (Pl's Brief, p. 15). With respect to the issue of individualized assessments pursuant to Social Security Ruling 85-15, the Court concludes that the ALJ's decision adequately addresses Plaintiff's ability to adapt to stress. Specifically, the ALJ noted that during her consultative psychiatric examination by Dr. McDonald in November 2003, Plaintiff acknowledged being the primary caregiver for her four-year old son who recently had open heart surgery and her one-month old daughter,[46] and the sole caregiver of the children

---

inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."

[45]Social Security Ruling 85-15 provides that the evaluation of a mentally impaired individual's ability to adapt to the demands or "stress" of the workplace must be made on an individualized basis and must be reflected in the ALJ's RFC assessment.

[46]As noted previously, with respect to her son's heart surgery, Plaintiff specifically told Dr. Puesan that, although the surgery was extensive and lasted five hours, she handled the

38

during the week because her "husband" is employed as a truck

driver.  (R. 23).  The ALJ also noted that during the hearing,

Plaintiff testified that she is single and cares for two small

children, a five-year old and a 1½ year old.[47]  (R. 24).  In

addition, in his assessment of Plaintiff's RFC, the ALJ

specifically limited Plaintiff to low stress (*i.e.*, no high

quotas or close attention to quality production standards),

simple, repetitive work with minimal interaction with the public

(R. 25), which are the limitations that are supported by

substantial evidence of record, including the Mental RFC

Assessment completed by Dr. Dalton on January 20, 2004.  (R.

278).

Finally, as to the ALJ's alleged failure to include

Plaintiff's stress-related limitations in the hypothetical

questions posed to the VE, a review of the transcript shows that

this claim also is meritless.  The ALJ's first hypothetical

question specifically limited the hypothetical individual to

simple, repetitive tasks in a routine work setting and low stress

environment (*i.e.*, an environment that does not involve high

---

situation "quite well."  (R. 168).

[47]In this connection, the Court also notes the following
testimony by Plaintiff in response to a question concerning her
ability to care for her children: "... I take good, good care of
my kids.  My kids are well bathed, well fed, well dressed."  (R.
311).

quotas or close attention to quality production standards), with
no more than incidental interaction with the public.   (R. 319).

5.

Finally, Plaintiff asserts that the ALJ erred in relying on
the VE's testimony to find that she retained the RFC to perform
other jobs existing in significant numbers in the national
economy because he did not elicit testimony from the VE
concerning the edition of the Dictionary of Occupational Titles
("the DOT") on which he was relying to respond to the ALJ's
hypothetical questions.  Noting that the fourth edition of the
DOT was published in 1977 and revised in 1991, Plaintiff
maintains that she is "entitled to this information to insure
(sic) that the VE was relying on up to date data in stating the
characteristics and job requirements of positions he testified
plaintiff could perform."  (Pl's Brief, p. 16).

After consideration, the Court concludes that this argument
is frivolous.  Plaintiff offers no authority for this argument
and the Court's research revealed none.[48]  Moreover, in light of

---

[48]Pursuant to Social Security Ruling 00-4p, an ALJ does have
an affirmative duty to ask a VE about any possible conflicts
between the VE's testimony and information provided in the DOT.
In the present case, the ALJ complied with this duty.
Specifically, the ALJ asked the VE whether his testimony
concerning the jobs Plaintiff could still perform in light of her
RFC was consistent with the DOT, and the VE testified that it
was.  (R. 325).  However, the Court could find no authority for
Plaintiff's claim that the ALJ also has a duty to ask a VE
whether he is relying on the latest edition of the DOT.

40

the fact that the latest edition of the <u>DOT</u> was revised in 1991, it is very unlikely that a VE would be utilizing an older edition in 2005, when Plaintiff's hearing before the ALJ was held. Finally, and perhaps most importantly, Plaintiff fails to identify any differences in the various editions of the <u>DOT</u> which would have an impact on the VE's testimony in this case, and her counsel had the opportunity to ask the VE to identify the edition of the <u>DOT</u> on which he was relying, but he failed to do so.

**V.**

Based on the foregoing, judgment will be entered in favor of the Commissioner and against Plaintiff as a matter of law.

_William L. Standish_

William L. Standish
United States District Judge

Date: July _30_, 2007

41